When you're ready Mr. Fazola. You may proceed. Good morning. May it please the court, Jonathan Fazola on behalf of the estate of Najee Ali Baker. I'm honored to be here today so your honors are aware with Ronald Baker, Najee's father, and he wanted to make sure I extended to you his and giving us oral argument so his family through me could be heard so we appreciate that. Wake Forest knew and was on notice that fights, brawls, and escalating violence were regular features of late-night barn events dating back to when the barn opened in 2011. Despite that well documented and lengthy history of violence, in late 2014, Wake Forest slashed on-site security for barn events to a single police officer stationed outside the barn. Wake Forest was repeatedly warned and knew that the one-officer plan was unsafe and irresponsible. Wake Forest hired hands-off security, wanted its own hands-on security for when fights broke out. Student hosts repeatedly begged Wake Forest to let them hire their own or additional hands-on security, such as bouncers for barn events, specifically to keep fights from escalating. Wake Forest's own police chief advanced a recommendation to bring back Winston-Salem. The fact that this that this was outside the barn and involved a shooting and there had been no shootings on campus in the modern era, what does that do to your foreseeability argument? Well, and thank you for the question, Your Honor, or I guess two questions. The fact that it was outside the barn has no difference in terms of foreseeability because those prior events that had broken out and escalated, escalated in various down the roadway and into the parking lots and Wake Forest knew and understood that that was the environment, the specific corner of campus where the risks of altercations at the barn would be located. We know that based on their own diagrams, based on their prior reports, and based on the fact that Officer Bottoms on the night in question when he came out of the barn with no idea what was going on inside but had zeroed in on one individual who he decided he needed to make sure to de-escalate the situation and have him followed down the road, when he radioed for backup he didn't ask them to come to the barn. He asked them to report to Lot W where he knew and understood that's where the attendees of the barn event were told and directed to park. As to no prior shooting, the case law and the rule in North Carolina is clear through Foster that through the exercise of reasonable care, Wake Forest only needed to have foreseen that some injury would result from an act or admission or that a consequence of a generally injurious nature might have been expected. That's precisely what the prior events but also the direct warnings that Wake Forest gave Wake Forest actual direct and construct knowledge of. That's why the rule used by the district court, which was basically the rule advanced in the dissent of Foster, of a high degree of recent similar criminality is just not the law in North Carolina. In response to Judge Thacker's question and I understand you said the scope of concern, if you will, based on past events would be beyond, I think you're dealing with, to include the parking lot, but is that scope the same scope you said that if they had had the, as you say, appropriate number of police officers, how far would that have extended? A mile from it or what? The parking lot? What would be the terminus of what you say, because as you know we're going to get down to proximate cause and beyond that kind of thing, how large is that area that policing would have included, that you say reasonable policing would have included? Well, it's a great question, Your Honor, and I don't think we specifically called this out in our brief, but if the record shows that the roadway that we talk about from the barn, the single roadway that was effectively put there just to get to and from the barn, was about 300 or 400 feet long, no more no less. So not a large large roadway we're talking about. Parking lots were, there were two parking lots, Y, U, and W, just off that roadway and then from there there were gatehouses which per its policy and practice, Wake Forest had IDs, or had attendees coming to barn events to check their IDs. So that's the specific area of the campus in which the risks of flights escalating from barn events and occurring and breaking out was foreseeable to occur. That was the general environment where they had occurred in the past, and that was the general environment when fights broke out, when police officers were at the barn, they'd radio for backup to lot W, to the roadway, because they knew and understood as the crowd is moving away from the barn, and if there had been violent episodes, that's where they could continue to erupt and spread. Vice President, sorry, Your Honor. Is the reasonable foreseeability of things escalating, fights escalating, to the point of a shooting on the roadway outside the barn? The reason for foreseeability is they knew that there'd be fights that could escalate. Fights can escalate in a variety of ways. They had escalated at previous events for someone to being beaten unconscious to the extent that he couldn't talk, had to be transported. And that incidents when someone was unfortunately beaten unconscious, that was in the pre D. O. S. Plan era, right? Sure. If we're going that was at a time when the barn was in the view, I think of appellant more heavily policed, right? That was your honor. It was also at a time where there were some overcrowding and capacity issues. But the nature of the risk of fights escalating and people, I mean, the individual does beaten unconscious. It happened right near the exact, almost the precise spot where Nagy was shot. He was followed down by Palmer and Piccolo time when it was heavily policed in the pre D. O. S. Era. Correct, correct. And even that heavily that heavy police force, because of the nature of the brawl at that particular event, you know, Chief Burke had warned when he went and consulted when fights break out. Each fight deserves an officer's attention in the less officers on site, the less officers there to dedicate that attention to those fights to address them. And once an officer's attention is distracted by one fight, you have a less on hand security to address others that may break out. I mean, it's precisely as a sequence of events played out on January 20, 2018. What happened with Officer Bottoms? He went in, didn't know the identity of the tank top, used his reasonable police judgment to say this young man looks kind of heated and out of control and I need to tell him to chill. He told him to chill and he testified that he did that to prevent things from escalating. He understood the importance of that and he also understood the importance of following and having a police officer follow that young man down the road. Fortunately, it wasn't that he didn't. He hadn't zeroed in because he didn't know on the individuals that presented the most heightened risk of harm that night, Shakir Austin and Malik Smith, because he didn't know they were the initial combatants. He didn't know that Malik Smith, for example, had no right to be in the barn in the first place. And he didn't know that Mr Willie, W. S. U. Employee and student who's standing outside the barn, heard a group saying, heard a group in which one individual said, go get your gun, go get your gun, pull it out, go get it. Testimony from police officers that we that if they had heard that it would have immediately signaled to them a potential immediate threat to public safety, would have required an immediate police response, would have required them call back up, search for the individual who might be going to get his gun, maybe detain him, question him and make sure he wasn't a risk. That didn't happen. And if your honors, it's kind of a dance. But if you look between Officer Bottoms video camera in which is, I think, DMJ four in the video of the first Shakir, then Malik, then Najee, then the individual, the tank top and then Officer Bottoms leaving the barn. There's a reasonable basis to infer that Mr Willie may have heard the seen the extra scuffle and then heard, go get your gun, go get your gun approximately five minutes before gunshot rings out. He sat with that in his pocket because he was untrained and he was unprepared to fulfill his responsibility, which Wake Forest had given him, which was to identify risks as his testimony and report them up armed with the knowledge for four or five minutes. It's someone after a fight inside the barn, escalation outside the barn. Someone said, go get your gun, go get your gun, pull it out, go get it. Sat there with his hands in his pockets. Didn't convey that information to police. So when Officer Feltz goes down the road, her police lights are off. There's absolutely no urgency. And if you watch Officer Bottoms body cam, he ends up walking down the road. If the gunshot is fired, causation. How? How do? How are we to square the fact that on the record here in all the incidents you cite to more incidents occurred at the barn before the D. O. S. Plan was implemented. Then after in terms of Wake Foresters, I noticed that the features of that plan presented a specific, unique risk that when fights broke out, there'd be less on hand security to address it. And that that meant when they did break out, they could escalate more dangerously than they even had in the past. Uh, important piece of that. So, Council, I want you to finish Judge Thacker's question about this one. Make sure I with the new plan results in less incidents and fewer incidents and incidents of less severity that that shouldn't affect their foreseeability. Well, first of all, your honor, we wouldn't necessarily concede that it resulted in less incidents again. We think there's a material dispute effect on that issue. What we would say is, you know, there's a discussion of us making artificial line drawing in her declaration. Chief Lawson says after the Burkhead's recommendations, things didn't get better, right? But if you look at the data on that, there were only fights and altercations at about 11% of events. Now, there was a short time period, sure, but that's because Wake Forest quickly abandoned that plan and moved to its one officer plan. But the reason that's important is there's a reasonable inference to be drawn that the improvements that were seen at the barn were the result of Burkhead's recommendations, which were introduced and then perhaps a relaxation of the reduced the jam at the door and may have reduced some of the pushing and shoving. But what it did is it let more as a person that was convicted of the shooting actually have a valid student identification. You know, he testified that he did, uh, that he wasn't an active student at the time, but that his I. D. Was not had not been revoked. So he said he was carrying it. If somebody looked at it at the door, it would have appeared valid, at least even assuming it should have been revoked, assuming potentially, but his compatriots wouldn't have changed anything. Well, it would have, because it's at least with respect with respect to this, the shooter in his I. D. With respect to Mr. With respect to secure Austin, that's correct. Your honor. Absolutely. But his compatriots were not college students. They didn't college I. D. S. And remember the initial big old bra is secure. Austin described it didn't start between him and Nagy. It involved Malik Smith, who should have never been there, didn't have an I. D. And wasn't a college student had no business being in there. Um, and so to get back to my point about the I. D. Wake Forest was I noticed its officers testified that when non students came, it increased the risk of criminality. And, you know, Winston Sam Police Chief Assistant Police Chief Miles. I think she said when non students come, they bring trouble. And so effectively, the new plan said we're gonna throw up in the barn doors to increase criminality. We're gonna go 50 50 on that. And then when there's interior fights breaking out, we're gonna leave it to students who themselves the student hosts are telling us we need bouncers like a bounce club or like a like a dance club. We don't feel safe diffusing these fights. And they also there's evidence that they were disinclined to go get the single officer outside the barn because they didn't want the police coming in, which further compounded the dangerousness of the one officer plan. I see that I'm over my time and I'll ask you a question where you go. It's not going on either way for the rebuttal time. It's fine. I want you to respond for your colleagues and other side address the court getting back to foreseeability. Take it back a little back to law school. First year law school. And for your members should be a lot better first year than mine is. There's a whole lot more years ago for me. But, you know, I think wagon bound type thing where it was that a fire might occur. But it was actually actually remember the case was actually a freak way that it happened. And basically it doesn't matter that the fire occurred. Uh, if I didn't have to occur the way it happened, you couldn't stop foreseeable necessary foreseeability that how it happened, but that it might be a fire. So you don't have firearms as you as you said to the court in terms of past. My question is this. So then it seemed that you'd have to have some kind of level of severe type injury, or at least that would be important to the case. Do you have any evidence that someone was hospitalized, severely injured in any of these brawl because the brawl is goes from none of which are correct mind you, but pushing, pushing, shoving. Yeah, you get out of my face and that's a brawl, right? Right. But how is any evidence of injuries, hospitalizations or someone unconscious or whatever in this record? There is. There's the individual who's beaten unconscious, could only moan, was taken to the hospital. There's the individual. Yeah, correct. Your honor. And then talk about prior to. And then there's the incident of the young woman being trampled by the crowd. And when she's being transported by Wake Forest Police Department saying, I don't feel safe here at these barn events with all these non students. And while she's at the hospital, she overhears another barn attendee who had a gash in his head and was hospitalized, saying he had a gun pulled out him at the barn. Okay. And the unconscious incident was in 2012 before the D.O.S. plan. When was the young lady trampled? When was that? That was also prior. Also before the D.O.S. plan. November 13. Correct. Okay. But again, those revealed the risks of fights breaking out and escalating outside of the barn. She was trampled outside of the barn. And the purported gun that was pulled, I believe, was either as the crowd is moving out of the barn or in the grassway of the barn. And after the D.O.S. plan, we saw incidents again and again that showed when fights broke out, they'd escalate. ERMs got punched in the face, pushed in the door, etc. Are there any after the D.O.S. plan in answer to Chief Judge Gregory's question where hospitalizations were required? Not in the record. No, your honor. Other than. Okay. Thank you. And I appreciate that. Thank you. Good morning. May it please the court. My name is Robert King. I'm with Brooks Pierce Law Firm in Greensboro, North Carolina. I represent the defendant appellee in this matter. Wake Forest University. I'm joined at counsel's table by the Deputy General Counsel of Wake Forest, Ms. Dina Marty. I appreciate the opportunity to be here. If it's agreeable to the court and time permitting, I'd like to address four topics and would like to give the court a quick overview of what those are. First, it occurred to me as I was preparing for this hearing that we really did a poor job in our briefing in describing to the court what is meant by reasonably foreseeable in this context. The first thing I'd like to talk about is what reasonably foreseeable means. And what that means is that this type of crime or something similar to that was likely. If it's not in your brief, you can't argue it. Well, then I'll move around some, your honor. I mean. I'm not trying to stop you, but you know that's the rules. You can't, you know, you didn't brief it, but go ahead. I understand, your honor. And here's my point on that. Everybody agrees that the standard is that the crime or something similar to that is likely and what we really did not expand on is what likely means in this context.  Second, I'd like to address why the plaintiff's basic argument is wrong. Plaintiff's basic argument is that fistfights in 2012, 2013, and early 2014 made a fatal ambush shooting outside the barn likely or highly probable to happen years later. Third, I'd like to address the two alternate theories that the plaintiff has come up late in the case to try to avoid the problems that they have with foreseeability. I will also add that of the five things that the plaintiff was required to show evidence of at summary judgment, the  existence of a duty, contours of the duty, breach of the duty, proximate and actual causation, and damages, they showed one, damages. We have been asking from the beginning of the case, what was it that you say we were supposed to do that would have prevented this shooting? Standing here on March 10th, I still have no idea what the answer is because the plaintiff failed to come forward with any evidence on that. So the plaintiff's two alternate theories are voluntary undertaking, sometimes they call it negligent undertaking, and never been recognized in North Carolina. That theory under a different label has already been rejected by the North Carolina Court of Appeals. That theory with that label has been rejected by this court in the Durden case. And then what I jumped ahead to, the fact that plaintiff, in fact, failed to present any evidence at summary judgment of what the duty was, how the duty was breached, or what it was that Wake Forest supposedly could have done to have made a difference. So what do we mean by reasonable  foreseeability. Plaintiff themselves say that they were not able to quote the correct rule, quoting from Murrow v. Daniels on page 24, in fact, of plaintiff's brief. A landowner owes a duty to exercise reasonable ordinary care to protect his patrons from intentional injuries by third parties when the owner has reason to know that such are likely to occur. Not that the injuries might occur. Because as the North Carolina courts have said, in some respect, all crimes are foreseeable. I could walk out of here and be shot in front of this building. That's not the standard. The  fact that there have been fistfights that mainly had occurred several years before. V. GEN. CODY, BYRD. So, counsel, on that point, assume for the sake of discussion that you have a strong argument about the events in the years leading up. What about the day of the incident, the day of this accident when there's comments that a Wake Forest security official heard that, you know, go get the gun? I don't have the exact language. But, and I can foresee issues with that related to breach of duty or causation. But how does that not at least create some foreseeability on the day of the event? Thank you, Your Honor. Great question. That was in my outline, and I'll go ahead and address that. First of all, the evidence in the record as to the time difference between when this student employee heard this and when he heard the gunshots was two to three minutes. That is a late-blooming theory. It is not in the complaint. Well, that might get to whether if they did something, they breached the duty, and it might get to causation. But stick for the moment with foreseeability when a Wake Forest security official apparently hears go get a gun and decides it's not really a real threat. Okay. And I will do that, Your Honor. First of all, as I was mentioning, it's a late-blooming theory. It's not in the complaint. It's not mentioned at all by their expert, because their expert didn't say anything about it. Our experts didn't say anything about it. We start dealing with this issue in summary judgment after the close of discovery. But let's be clear about what was said, because that theory makes absolutely no sense. What this person overheard was not I've got a gun, I'm going to go get a gun, or he's got a gun. It's one person walking away from a building yelling at some guy down the road, go get your gun. Well, by definition, nobody had a gun. So what was it that somebody was supposed to do? Was a police officer supposed to run and grab this person and say, why did you yell that? Well, I thought this guy might have a gun. Go grab that other person. Do you have a gun? By definition, he didn't have a gun. So we're talking about this theory that was never raised before summary judgment. There's no evidence in the record, no suggestion by plaintiffs as to what should have happened. And I think that goes to the foreseeability and to the issue of breach of duty. I want to go back, if I could, for a second, to the foreseeability issue, because it is important to consider, I think, how tough the North Carolina law is on this. I have read every case in this topic or in this area. These cases go back to 1934, Ward v. Southern Provenance. North Carolina appellate courts five times have ever said that a plaintiff presented evidence of foreseeability and proximate causation sufficient to get to a jury. That was a shopping mall with a long history of similar violent crimes, a bus station with a long history of violent crimes, and three motels in high crime areas with long histories of crimes. In our situation, Wake Forest has got to be one of the safest places in North Carolina. In 63 years, we've never had a homicide, we've never had anybody use a firearm for anything, we've never had a crime anywhere remotely near this. The record, counsel wants to speculate about the idea that maybe there's a factual dispute about whether or not things improved over time or not. They did improve over time, and there's nothing but speculation on the other side that it did not improve over time. Alito, is that our lens that Wake Forest as a whole or should – I think your colleague would say maybe generally that's true, but the lens should be at this barn rather than the school as a whole. So I'm not saying who's right, who's wrong, but I'm pretty sure that's what they would say to that. What's your response to that? Well, I would start with saying that the plaintiff gets to frame the issue in the complaint. And if you read the complaint, this is a complaint about campus security. It is not a complaint just about the barn. Let's say it's just about the barn. Never been a homicide at the barn, never been a fatal shooting at the barn. And here's the thing that really – this whole thing about we've had these fights and things might escalate, I think that actually hurts plaintiff's case, and here's why. The argument is fistfights make it foreseeable that someone's going to pull out a gun in the heat of passion and shoot somebody. Well, first of all, that's not what plaintiff says happened. What plaintiff says happened is that Najib Baker was calmly strolling to his car when he was ambushed. So this whole idea that there was a fistfight and somebody became enraged and pulled out a gun is not in fact what plaintiff themselves says happened. Second, the fact that there have been fights on campus and none of them ever resulted in this type of injury kind of proves our point. Look, Wake Forest has had a campus here for 63 years. And where there are colleges, there are college parties. And where there are college parties, there are overheated young men. And where there are overheated young men, there are fistfights. We've got 63 years of college people doing the things that I did and other college people do, and nobody ever pulled out a gun. Nobody ever had a gun. Nobody ever got murdered. You talk about data points. That's 63 years of that. And let me mention this. I've been struggling with this idea of how to put the incredibly unprecedented nature of this into arithmetic terms or mathematical terms. And I came up with this idea of the visitor day, sort of like a work day. One person on the campus one day is one visitor day. If you take the number of days that this campus has existed prior to the shooting of Mr. Baker, multiply it just by the number of students, faculty and staff, forget people coming to parties, forget visitors, forget vendors, you have 500 million visitor days before the shooting where nothing remotely similar to this happened. If I rolled the dice 500 million times and it comes up snake eyes every time, it is not foreseeable that anything else is going to happen. So this idea that fistfights turn into shootings is rebutted by the actual facts of this case. I want to talk about two cases. I mentioned there are only five cases in the history of North Carolina jurisprudence and they are all terrible cases. The lesson there is don't go to motel parking lots at 2 o'clock in the morning because that's what most of these cases are about. Let me talk about two cases where the court said there is not foreseeability that are pretty remarkable cases to me. And the first one is the granddaddy of them all or the grandmother of them all, Ward versus Southern Railway. 1934, for 30 years, people have been climbing on coal cars and throwing chunks of coal over the side, which was a crime. They were stealing coal. The railway knew it for 30 years. Somebody throws a piece of coal off and this particular time it hits a brakeman on the head and kills him. The brakeman's family sues the railway and the Supreme Court said yes, this criminal activity had been going on for 30 years, this exact activity. Yes, the railway knew it was going on for 30 years. No, it was not foreseeable because nobody had ever been hurt. The other one I'll mention to you is Purvis versus Bryson Jewelers, which happened in my hometown. Purvis versus Bryson Jewelers was a situation in which somebody was injured during an armed robbery at a jewelry store. There had been a number of cases in that case. Do you think it may have been a difference that there was trespassers who were the tort thesis third party as opposed to invited guests to the barn and a regular type event that the school quasi-sponsored by allowing it? No, that's a great question, Your Honor. The law in North Carolina prior to 1998 was that there were different standards for trespassers, but that was if the trespasser was the plaintiff. It was the duty owed to the person. So the standard of care in 1934. Can you tell me that being responsible for a third party's acts, the fact that the trespasser would not factor into that analysis? Not based on any of the cases that I've read, Your Honor. Because the issue is not whether these people were trespassers. The issue was whether or not the railway knew that this activity was going on, that this criminal activity was going on. And what the Supreme Court said was, yeah, it went on for 30 years. Yeah, the railway knew it was going on. Yeah, the exact same thing happened that day that had happened for 30 years, but it was not foreseeable that someone was going to get hurt because this time somebody got hit on the head and it had never happened before. The purpose case that I would mention to the Court, jewelry store robbery. In the vicinity of the jewelry store, there have been 937 crimes and 24 armed robberies in the prior three years. Now, that sounds like a foreseeability situation, and the Court of Appeals said that was not foreseeable because none of those happened at a jewelry store. That's the standard in North Carolina, and that's why we've got five cases in 88 years, and all of them are egregious situations. The Wake Forest situation could not be any more different than the five cases where the Court has found foreseeability. I want to cover that. Oh, here's the other thing I would mention on foreseeability. We have to keep in mind how many security professionals had looked at the barn and considered security at the barn prior to the tragic shooting of Mr. Baker. Wake Forest police had looked at it. Winston-Salem police had looked at it. Chief Burkhead had looked at it. You had all these security professionals that came in, they thought about it, they looked at it, they wrote about it. Not a single person ever said, I'm afraid there's going to be a shooting. Not a single person ever said, if we don't do this X, Y, or Z, I'm afraid there's going to be a homicide. If it was foreseeable that activities at the barn were going to result in a homicide or a shooting, let alone an ambush shooting, why did every single security professional miss that fact? I think I've addressed one of the two alternate theories. Plaintiff has put a lot of stock in this idea of the voluntary undertaking, although sometimes they call it a negligent undertaking. As I mentioned previously, that has never been recognized by a North Carolina court of appeals applying a different label. In the case of Urbano v. Days Inn, the plaintiff was attacked in a motel parking lot, as most of these cases are. One of the plaintiff's arguments was, and this will sound familiar to the court, that the motel said to the public, we are providing security and our property is safe. That is exactly what the plaintiff is trying to argue here. Now, in the Urbano case, the label that the plaintiff put on it was implied warranty. It's the same thing that's being argued here, voluntary undertaking. And the North Carolina court of appeals said no, because what you're trying to do is you're trying to get around the foreseeability argument. What you're trying to do is completely rewrite North Carolina law by making people guarantors. And this is exactly what they said. Under our decisional law, an innkeeper or other occupier of property is not the insurer of the personal safety of the business invitees, period. This exact argument has already been rejected in North Carolina law. It could not be a more transparent effort to avoid the issue of foreseeability. I'll also mention that the Fourth Circuit, applying North Carolina law, has rejected voluntary undertaking and a wrongful death. Not a wrongful death. It was an assault case in the matter of Durden v. United States as well. I'd like to briefly touch on... In your arguments that you regaled us in North Carolina law for 80-some years, would it be different if this happened in a dorm? Because you opened the door by extolling the history of the university in general, so you opened it up. Would this be different if it happened in a dorm? I don't see how... If everything else was the same, Your Honor, I think the answer is no. Because the issue is, what have we seen in the past? And none of the courts quite put it this way, but what all these cases boil down to is that when you hear about the crime, if your reaction is, yeah, I saw that coming, then it's foreseeable. Sixty-three years, half a billion visitor days without something like this happen, I don't know how you can say that it was foreseeable that this was going to happen. Last thing that I would mention, because this Court can obviously affirm on a summary judgment record on other grounds, Plaintiff completely failed to provide any evidence at summary judgment as to what the standard of care was. They've never said... Because here's what we would... Here's what we expected when this lawsuit got filed. I thought they would bring in former chief of police from Tech State University, who would say, I've done a risk assessment of this property, and Wake Forest failed because they should have done A, B, and C. And if they had done A, B, and C, this shooting would not have happened. And of those things, Plaintiff did none of them. Plaintiff did not provide an expert who had any knowledge about how campus security works. He said that how other than to say what the standard of care was, and there's no indication of causation in this matter. What in the world was it that we were supposed to do? And the answer that we get in the briefing is, well, if you'd had more police officers, maybe one of the police officers would have been in the right place at the right time. I mean, that's just rank speculation of counsel. That is not evidence before the Court. So if the situation, despite the fact that in 63 years nothing remotely similar has happened, despite the fact that this facility was repeatedly analyzed by security professionals and not a single one of them said, I'm concerned there's going to be a shooting, I'm concerned there's going to be a homicide, the Court will be massively rewriting North Carolina law. And what will be happening is that property owners will become guarantors of the safety of the people that come on their property. And that's something that the North Carolina Supreme Court and the Court of Appeals have been saying since 1934 is not the law. What happened to the Baker family is awful. And I hate to get up here and make an impassioned argument when I've got a grieving family across the aisle. It is awful what happened to them. But this is not the University's fault. I appreciate the Court's time. Thank you, Counsel. Senator Soto, you have some time. It's categorically untrue that this case is about campus security writ large. Your Honors have our complaint. We don't make it about campus security writ large. That's evidenced by the fact that when Wake Forest tries to cite our complaint in their brief to make it a case about campus security writ large, they inaccurately quote and leave out key passages. The case has always been about... You can argue the case the way you want. You're up on rebuttal. But it might be helpful, at least to me, for you to answer this question to the breach. What standard of care and what breach of that standard? It's first incorrect that our expert, Dr. Kirkham, didn't provide a standard of care. Mr. King, during his deposition, didn't ask him about the central opinions in this case. The reason Dr. Kirkham opined that doing a campus-wide security audit wasn't necessary is because that's not what his opinions were directed at. His standard of care he articulates is having sufficient on-site security to respond, see, and intervene in fights to de-escalate them and to, without force, escort people off the campus. I'm a little shocked to hear Mr. King say he still has no idea what Wake Forest could have done. They could have done what they had been doing, what their officers' plans had shown. They could have been done what they did previously. So you're saying that your expert established, let's say, in your view, that there was a breach of a standard. That would be the standard of staffing, right? Am I correct? Correct, although I will push back that in these cases, there is not a requirement that we establish standard of care through expert testimony. And I also... I'm just trying to figure out what you do have. I didn't say that. I'm saying that you, is it correct that, forget about standard, your expert established a guideline for staffing requirements. Numbers of police officers, positioning, right? That's what you said? He did not establish a guideline because his point was you could use various mixes of security. What was important, though, was to make sure you had officers or officers inside to monitor risk. He offers an alternative, making sure that if you reduce the number inside the barn of officers, because you don't want too many, because of student perceptions, make sure they have radio contact with outside officers or other security officials on the ground. That didn't happen here. Again, that would have been a way the inside people responding could radio out and say, we have people coming out that were involved in a fight. One of them is wearing a red hoodie. It's pretty easy to spot. But standard of care was articulated by the officers we deposed themselves by saying, for example, Sergeant Fisher recognizing the importance of having on-site security interior to identify, quickly respond to risks. Sergeant Gravely testified to that. And our Sheriff Burkhead, who offered his recommendations, I mean, that's one of the reasons I'm surprised. What could they have done? Here are his recommendations. Officers inside to monitor potential risks. Enforce ID rule, no exceptions. I think you've answered my question. The next is on that is having, let's assume you did that, what about causation? That's a lot of layers in these kind of cases. What about causation? There's a number of things that could have prevented this shooting that Wake Forest could and should have done. Again, if they had someone inside to monitor the risk and quickly identify the combatants, they would have been able to detain, or not detain, at least. Did this fight spill into the parking lot? You know what I mean by spill, right? Well, it spilled outside of the barn and continued. But did it spill into the parking lot? You know what I mean? Do you want to make that clear? Yeah. I would say it spilled in the form of Malik Smith, who by Keondra Johnson's testimony, ran to his car to get a gun to run back up the road, still operating under the heat of the moment. And if you believe Ja'Kerr Austin's testimony, he was, quote-unquote, tripping and he was mad, there's no evidence that suggests a different motive for them to shoot Najee, other than a continuation of the fight that happened in the barn that escalated outside and that led down foreseeably down the roadway. And I do want to say, because my time is limited, Your Honors, the discussion about foreseeability that Mr. King keeps bringing up is just simply not the rule in North Carolina. You do not have to show a prior homicide to make a homicide foreseeable. And importantly, that's a foreseeability rule for circumstantial evidence. What's that, Your Honor? You have to show that it's similar in some way. I take it that it doesn't have to be an exact match, but some similarity. The lines the court draws are that crimes involving actual or threatened physical harm, those are relevant to circumstantial evidence, and crimes that don't involve that, property crimes, robbing things from cars, that's the lines the courts have drawn. They've never said you need to show substantial similarity. That's the dissent in Foster. And again, that's under the circumstantial evidence test. We have direct knowledge of warnings. Mr. King brought up college parties. I've never been to a college party where I left saying, that was a great party, but what could it really use is some bouncers to make us safe. We also have evidence that Rhino Security wasn't aware that requests for bouncers were being made, and that those requests by the sorority never made it to the police force. The Chief Lawson, there's no evidence she was aware that the student hosts were saying, we need bouncers to make this event safe. Can I follow up a little bit on the discussion of the North Carolina cases? And I take to some extent at least your point about criminal activity involving property versus criminal activity involving personal injury or bodily injury. But does it matter that in those cases there is criminal activity? And again, I'm not meaning to condone fighting on campus. But is fighting on campus, even as it shouldn't happen, the same? Is it criminal activity and does that matter? I believe it is criminal activity. Most importantly, it involves actual or threatened physical harm to somebody. And that's enough to trigger, and again, that's the circumstantial evidence box, foreseeability under Foster. On frequency, I need to make this point if I can. There were two to three barn events a semester, four hours a barn event, okay, over six years. I'm not a mathematician, but if you do the math, that's about 12 hours of barn events each semester, which would be about 12 convenience store days, if we assume a convenience store is open, 12 convenience store days during the life of the barn. If you view the frequency of fights, altercations, both before and after the DOS plan, against a matrix of 12 convenience store days, if that frequency was happening at any convenience store in America, we'd all expect that they reevaluate what they're doing to make sure that their customers, unknowing customers coming onto their property had sufficient safeguards in place. And with that, I see I'm over my time. I could talk forever, and I appreciate Your Honor's time and patience today. I took some of your time. I'll give you two minutes if you want, because it was your rebuttal. Okay. And I really do appreciate that, Your Honor. I want to say quickly, just I'm going to go through, the reason I want to make this a campus security case is those are the whack-a-mole cases, right? How are we supposed to know about that? Whack-a-mole, right? Random abduction in the corner of campus not related to an on-campus event with a history of violence at a specific location with a history where you know it's going to be there at a limited time with a crowd of people. Whack-a-mole, right? Even motel parking lots. Who knows when the motel bandits are going to show up at any given time? That's a security whack-a-mole, you know? And so we might, under circumstantial evidence, yeah, we want to make sure that there's sufficient foreseeability there. Here, we have an event in a specific corner of campus, specific time, with specific persons going to be there, with specific knowledge of the known risks, and it's completely different than a campus-wide security case such as the one out of Louisiana, for example, where there's an individual sitting in a dorm and spontaneously out of nowhere stands up and shoots a young woman getting on the elevator. Those are the cases that are trying to make universities insurers of everybody's safety at all times, at all hours. That is often not a fair burden to put on a university. But here, when you have direct knowledge and circumstantial evidence telling you, we have barn events at a specific time, late night, and fights can break out and escalate, and you're being warned by your own hands-off security that they think you should have wands and you should have bouncers or bring back WSPD, and you're being warned by your own student host, including a month before the shooting where four fights broke out and didn't stop until it was down the road and a police could intervene, you have a duty to exercise reasonable care, to respond appropriately, and you certainly have a duty, we submit, if you've undertaken to do something that you're told is irresponsible and unsafe, to make sure you're exercising reasonable care in that undertaking. And finally, on that point, CASEL does not foreclose a negligent undertaking theory against premise liability or owners of premises. CASEL involved a private security firm in North Carolina. It's clear undertaking in those contexts is defined by a contract. The security firm had a contract. The contract did not require the security firm to intervene in the stabbing that was taking place. They were just supposed to be there to be a deterrent, so the court said it wouldn't be fair to impose on a duty here. They agreed to what their undertaking was, four corners of the contract. The court in that case did say, though, that the provision of the security by the hotel may be relevant to the, or excuse me, by the apartment, to the apartment's liability, but the court didn't need to decide that issue because the apartment wasn't a defendant, at least in that portion of the case. I don't know how much more time your honors are going to give me. I appreciate it. It's red now. Okay. I apologize. I would just say as a final word, since you've indulged me, we ask that your honors reverse the district court and remand with instructions to set this matter for trial, and also with an instruction that the district court correct its opinion so that Najib Baker's name isn't confused with the name of his shooter. We thank you for your time and for hearing our case. Thank you. To counsel all, we appreciate your arguments here today. We would love to come down and greet you in our normal Fourth Circuit tradition, but we can't, but know nonetheless that we appreciate all of you being here and helping us on this case. Thank you so much.
judges: Roger L. Gregory, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.